Michel HAMID and Francis Hamid, Individually and on Behalf of the Estate of Megan Hamid, Deceased, Appellants,

v.

LEXUS, a Division of Toyota Motor Sales, U.S.A., Inc. and Toyota Motor Corporation, Appellees.

No. 01–10–00163–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 22, 2011.

Rehearing Overruled March 29, 2012.

John Roger Griffith, Jose Oscar Lopez, Griffith & Garza, L.L.P., Pharr, TX, Larry W. Lawrence, Lawrence Law Firm, Austin, TX, Raymond Curtis Alexander, Law Office of Raymond Alexander, Houston, TX, for Appellants.

Kurt C. Kern, Cary Alan Slobin, Craig D. Dupen, Fred C. Huntsman, Bowman and Brooke LLP, Dallas, TX, for Appellees.

Panel consists of Justices RADACK, SHARP, and BROWN.

## OPINION

HARVEY BROWN, Justice.

In this products liability case, Michel and Francis Hamid, individually and on behalf of the Estate of Megan Hamid, appeal a take-nothing judgment in favor of Lexus, a Division of Toyota Motor Sales, U.S.A., Inc. and Toyota Motor Corpora-tion. The Hamids contend that the trial court committed reversible error by including a "no liability" rebuttable presumption instruction in the jury charge.[1]

We affirm.

## Background

Megan Hamid died when she lost control of the 2002 Lexus ES300 she was driving. The accident occurred after 9:00 p.m. on an unlit section of Interstate 45 South. A dark blue vehicle had been abandoned on the left shoulder of the interstate, extending partially into Megan's lane of travel. When Megan steered violently to avoid the vehicle but failed to apply her brakes, she lost control. Her vehicle hit the barrier dividing the interstate, rolled numerous times, and came to rest in the northbound lanes of travel. Megan was severely injured and died the next day.

Megan's parents sued Lexus and Toyota on the basis that the ES300 was defectively designed because it was manufactured and sold without a Vehicle Stability Control device (VSC). According to their petition, a VSC (also known as "electronic stability control" or "ESC" device) is a safety technology that helps drivers maintain or regain control of their vehicle during emergency steering maneuvers. The Hamids claimed that the absence of the device rendered the ES300 defective and was a producing cause of Megan's death.

Lexus and Toyota (collectively Toyota) denied the allegations and asserted that, because the ES300 complied with the various mandatory government safety standards applicable to the vehicle at the time, they were entitled to a jury instruction on the statutory "presumption of safety" under section 82.008 of the Civil Practice and

---

1. *See* TEX. CIV. PRAC. & REM CODE ANN. § 82.008(a) (West 2011).

Remedies Code. *See* TEX. CIV. PRAC. & REM CODE ANN. § 82.008 (West 2011).

At trial, the Hamids introduced expert testimony that Toyota's decision not to include a VSC as standard equipment on the ES300 was a design defect that rendered the vehicle unreasonably dangerous. Their experts also testified that, had the ES300 been equipped with a VSC, Megan would have survived the accident. The VSC device compares the driver input or command with the vehicle's response. It "is designed to help the [car] do what the driver is telling the car to do." Through sensors, the device detects the driver input and the vehicle's reaction. Based on that information, it then decides whether to take countermeasures to stabilize the vehicle and does so if the vehicle does not respond appropriately to the driver input. For instance, the device may engage brake pressure predominately to one wheel in order to arrest or stop a spinout. The VSC also "reduce[s] the engine power to help the vehicle come back more in line with where the driver has commanded it to go" and can control throttle output. The Hamids' experts testified that the device constituted a "very substantial improvement to vehicle handling when you are in an obstacle avoidance maneuver" and was "highly effective" in emergency avoidance situations and in controlling slips and slides during maneuvering.[2]

Toyota's expert witnesses agreed that a VSC is a safety feature that helps prevent the type of sliding involved in this accident, i.e. rear wheel sliding. They testified that, at the time in question, only two percent of the vehicles in the United States were equipped with a VSC, which was an "emerging technology." They concluded that it was unnecessary and the

ES300 was a reasonably safe vehicle without it. They also testified that, even if Megan's vehicle had been equipped with a VSC, it would not have prevented this accident "given the specifics of this crash scenario ... because there simply wasn't enough time for it."

During the charge conference, the Hamids objected to the following jury question:

QUESTION NO. 1:

Was there a design defect in the 2002 Lexus ES300 at the time it left the possession of Toyota or Lexus?

A "design defect" is a condition of the 2002 Lexus ES300 that renders it unreasonably dangerous as designed, taking into consideration the utility of the 2002 Lexus ES300 and the risk involved in its use. For a design defect to exist there must have been a safer alternative design.

"Safer alternative design" means a product design other than the one actually used that in reasonable probability—

(1) would have prevented or significantly reduced the risk of the occurrence in question without substantially impairing the product's utility; and

(2) was economically and technologically feasible at the time the 2002 Lexus ES300 left the control of Toyota by the application of existing or reasonably achievable scientific knowledge.

You are entitled to presume that Toyota is not liable for any injury to the Plaintiffs if the evidence establishes that the 2002 Lexus ES300 complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the 2002 Lexus ES300 at the time of its

---

**2.** According to the testimony, when a vehicle turns, there is always some slipping; the question is the amount of slipping.

manufacture and that governed the product risk that allegedly caused harm.

Plaintiffs may rebut the presumption by establishing that the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risk of injury or damage.

Answer "Yes" or "No."

This instruction was based on section 82.008(a) of the Civil Practice and Remedies Code, which provides a statutory presumption of no liability in certain circumstances:

> (a) In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product's formula, labeling, or design complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.

TEX. CIV. PRAC. & REM.CODE ANN. § 82.008(a).

The Hamids objected to this question on the basis that the defendants were not entitled to the section 82.008(a) presumption because there were no Federal Motor Vehicle Safety Standards (FMVSSs) that applied to a VSC. They submitted their own question that did not include the presumption instruction. The trial court overruled the objection and denied the Hamids' proposed question.

The jury answered "no" to Question No. 1, and the trial court entered a take-noth-ing judgment against the Hamids. The Hamids appealed.

**Standards for Reviewing Charge Error**

■ The trial court "shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence." TEX.R. CIV. P. 278. Whether the charge submits the controlling issue in the case, in terms of theories of recovery or defense, is a question of law which is reviewed de novo. *Braudrick v. Wal–Mart Stores, Inc.,* 250 S.W.3d 471, 475 (Tex.App.-El Paso 2008, no pet.).

■ The decision of whether to submit a particular instruction is reviewed for an abuse of discretion. *Shupe v. Lingafelter,* 192 S.W.3d 577, 579 (Tex.2006). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). The essential inquiry is whether the instruction or definition aids the jury in answering the questions. *Lee v. Lee,* 47 S.W.3d 767, 789 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *see also Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 842–43 (Tex.2005). A court is given wide latitude to determine the sufficiency of explanatory instructions and definitions. *Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 791 (Tex.1995).

■ An instruction is proper if it assists the jury, is supported by the pleadings or evidence, and accurately states the law. *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex.2002). A jury instruction is improper if it comments on the weight of the evidence or "nudge[s]" or "tilt[s]" the jury. *Wal–Mart Stores, Inc. v. Johnson,* 106 S.W.3d 718, 724 (Tex. 2003); *see Torres v. Caterpillar, Inc.,* 928 S.W.2d 233, 241 (Tex.App.-San Antonio 1996, writ denied). It can be error for a

trial court to give the jury an instruction even when it is a substantially correct statement of the law. *Liberty Mut. Ins. Co. v. Camacho*, 228 S.W.3d 453, 460 (Tex. App.-Beaumont 2007, pet. denied).

### Preservation of Charge Error

■■■ To preserve charge error for review, a party must "point out distinctly the objectionable matter and the grounds of the objection." TEX.R. CIV. P. 274. "Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." *Id.* An objection does not satisfy rule 274 unless "the defect relied upon by the objecting party and the grounds of the objection are stated specifically enough to support the conclusion that [the] trial court was fully cognizant of the ground of complaint and deliberately chose to overrule it." *Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 404 (Tex.App.-Houston [1st Dist.] 2004, pet. dism'd). A party must "clearly designate the alleged error and specifically explain the basis of its complaint in its objection to the charge." *Id.* at 404–05; *see also C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 793 (Tex.App.-Houston [1st Dist.] 2004, no pet.) ("To be sufficiently specific, the party's objection must identify the claimed error and explain the basis of the party's complaint."). If a party fails to lodge an objection to the jury charge that timely and plainly makes the trial court aware of the complaint, error is not preserved and the complaint is waived. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex.2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992) (op. on reh'g). On appeal, the charge error complained of must comport with the objections made at the charge conference. *Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 383 (Tex.App.-Houston

[1st Dist.] 2011, no. pet. h.); *Wackenhut Corrections Corp. v. de la Rosa*, 305 S.W.3d 594, 616 (Tex.App.-Corpus Christi 2009, no pet.).

■■■ The Hamids' objection to the rebuttable presumption instruction was composed of these three sentences, only one of which was substantive:

> Mr. Griffith: We object to Question no. [1]. We don't think they're entitled to the presumption in this case because there is no Federal Motor Vehicle safety standard that applies to the VSC. So they don't get the presumption.

In reliance on this single objection, the Hamids make three arguments for reversal of the trial court's judgment: (1) the statutory presumption does not apply when no federal safety standard or regulation exists that "relates to the defect that has been alleged by a plaintiff," i.e., the lack of a VSC; (2) Toyota was not entitled to the instruction because the mandatory federal safety standards and regulations relied upon by Toyota "do not govern the product risk that caused [Megan's] fatal injuries: loss of vehicle control due to rear-wheel spinout caused, in turn, by the lack of [ESV/VSC]"; and (3) legislative history and "existing legal precedent" reveal that the rebuttable presumption was never intended to be submitted as a jury instruction and that it should disappear if contrary evidence is introduced. At best, the Hamids' charge objection preserved only the first of these three arguments. The other two arguments are not encompassed by the objection made to the trial court and therefore were not preserved.

Regarding their second challenge to the jury charge, we hold that the Hamids' objection did not plainly advise the trial court that they were objecting because the federal safety standards and regulations that were admitted during trial did not

govern the risk in question, nor was this argument apparent from the context of their objection. Under the charge, Toyota was entitled to a presumption if it complied with standards "that governed the product risk that allegedly caused harm." During the charge conference, the Hamids did not identify the risk in question, discuss the evidence regarding the mandatory federal standards that were admitted, or identify the risks addressed by those standards.[3] Indeed, they did not even mention the word "risk." The Hamids' objection was not focused on the admitted standards. Rather their argument was focused on the VSC itself. Thus, the Hamids' first argument—which was preserved—addresses the lack of a particular safety device and resulting defect, whereas their second argument—which was not preserved—addresses the lack of relevance of the standards that were admitted because they do not address the risks in question. By separating these two arguments in their brief, the Hamids implicitly acknowledge that they are not the same.

During the trial, it was undisputed that the ES300 complied with all applicable federal standards. In particular, Toyota demonstrated that the ES300 complied with the two applicable FMVSSs, namely FMVSSs 105 and 135, that govern safe braking performance and stopping distances.[4] See 49 C.F.R. §§ 571.105; 571.135. The Hamids did not object to the relevance of this evidence or contend that Toyota had not satisfied its burden to demonstrate that these standards governed the product risk in question. Although the Hamids presented expert testimony that there were no mandatory federal standards that related to or required a vehicle to include a VSC, their design expert, Mark Arndt, did not specifically address why the federal standards relied upon by Toyota did not apply to the Hamids' de-

3. The Hamids contend on appeal that the "threshold question" is whether the two FMVSSs governed the risk in question. But, this argument was not made during the charge conference. The parties disagree regarding the nature of the risk. The Hamids claim that the risk is "the failure to maintain vehicle control during emergency maneuvers due to rear-wheel spin out, which, in turn, was caused by the lack of an ESC/VSC system." Thus, they narrowly define the risk and, based on that risk, suggest that the vehicle is defective absent a VSC. Alternatively, they argue that the risk is defined as "the danger of loss of and/or failure to maintain control due to rear wheel spin outs (i.e. without reference to ESV/VSCDF standards)." The Hamids argue that the product risk is defined according to the plaintiff's allegations, and that they have never contended that the loss of control was due to a braking system failure.

Toyota, on the other hand, argues for a broad definition of the risk, defining it as "loss of vehicle control causing a crash" and contends that the two FMVSSs in question address that risk. Thus, according to Toyota, it satisfied the standards that "gov-

erned the product risk that allegedly caused [the] harm." They further argue that the product risk is not the absence of a particular safety device but the reasons for that safety control device.

The trial court never had an opportunity to decide which position was correct because neither party raised these contentions during the charge conference or identified any expert testimony defining the risk.

4. FMVSS 105 is the standard for hydraulic and electric brake systems. Its purpose is "to insure safe braking performance under normal and emergency conditions." 49 C.F.R. § 571.105. FMVSS 135 also pertains to brakes. It sets the standards for service brake and associated parking brake systems. Its stated purpose also is "to ensure safe braking performance under normal and emergency conditions." 49 C.F.R. § 571.135. Both these standards, then, specifically address the standards for brakes on vehicles in order to ensure safe braking performance under all circumstances. According to Jerry Walker, Toyota's expert on the vehicle's design, one purpose of these standards is to avoid spin-outs during braking.

sign theory. Thus, neither at trial nor during the charge conference did the Hamids notify the trial court that Toyota had not satisfied its burden of demonstrating that the federal regulations governed the risk in question. Similarly, the Hamids' argument on appeal that these two standards constitute performance, not design standards, and that the rebuttable presumption only applies to design standards, was also not made during the charge conference. Because the trial court did not have an opportunity to address these objections, they were not preserved. *Cf. Payne*, 838 S.W.2d at 241; *see Faust v. BNSF Ry. Co.*, 337 S.W.3d 325, 330–31 (Tex.App.-Fort Worth 2011, pet. filed).

Regarding their third challenge, and unlike their briefing on appeal, there was no discussion during the charge conference of allocating burdens of proof or production versus burdens of persuasion. Neither was there any contention about legislative history or case law on the use of presumption instructions generally. Instead, the Hamids' objection was directed at the use of the presumption instruction in this case based on the evidence. Therefore, this third challenge is also waived.

Accordingly, we turn to the only challenge that was preserved and consider whether the trial court erred in submitting the rebuttable presumption instruction because there was no federal safety standard or regulation that "relates to the defect that [was] alleged by [the Hamids]."

### Rebuttable Presumption Instruction

■ Under section 82.008(a) of the Texas Civil Practice & Remedies Code, a defendant manufacturer or seller in a product liability action is entitled to a statutory presumption of no liability only if the defendant establishes that the product's design complied with federal safety standards and regulations that "governed the product risk that allegedly caused the harm." TEX. CIV. PRAC. & REM.CODE ANN. § 82.008(a).

The Hamids argue that Toyota was not entitled to a rebuttable presumption instruction because the legislative intent of section 82.008 demonstrates that the presumption only applies when there is a standard that "relate[s] specifically to the defect that has been alleged by a plaintiff." Specifically, the Hamids contend that the determination of whether to submit the rebuttable presumption instruction is dependent upon whether the plaintiff's petition alleged a product defect covered by a federal safety standard or regulation. Citing to a statement included in the House and Senate reports, the Hamids contend that the presumption does not apply when a manufacturer complies "with all federal standards that exist for a product but no standard exists that related specially to the defect that has been alleged by a plaintiff."

■ Based on the plain and unambiguous language of the statute, we reject this contention and hold that the presumption's applicability is based on the relevant product risk, not the particular alternative design alleged by the plaintiff. *See Wright v. Ford Motor Co.*, 508 F.3d 263 (5th Cir. 2007). In *Wright*, a three-year-old boy was killed when a Ford Expedition backed over him. The boy's parents sued, alleging that the vehicle had a dangerous blind spot, that it was not equipped with any of the "viable and economically feasible safety devices, including back-up alarms," and that Ford's failure to include such reverse-sensing systems as mandatory standard equipment was a design defect. *Id.* at 268.

Ford defended on the ground that it had complied with FMVSS 111, which concerned rearview mirror performance placement "in order to protect the public from backing into deaths and injuries due to

limited rearview vision," and thus was entitled to the "no liability" presumption of section 82.008. *Id.* at 269. The trial court agreed and included an instruction based on section 82.008 in the jury charge. *Id.* The jury answered "no" to the design defect question, and the Wrights appealed.

The Wrights argued that FMVSS 111 did not govern the rear sensing system with which they contended the Expedition should have been equipped, making the inclusion of an 82.008 jury instruction error. *Id.* More specifically, they argued, based on statements in the legislative history, that the question is "whether the particular *defect* claimed was governed by the federal safety standard and not the risk arising from that defect." *Id.* at 270 (emphasis in original). The court held that the statute clearly addresses risk, not the particular safety device the plaintiffs alleged should be utilized. *Id.* Additionally, because the legislative history was not clear that the legislators distinguished between defect and risk, it was particularly unnecessary to review legislative history when the legislative history does not necessarily conflict with the plain reading of the statute. *Id.* at 270 n. 5. We agree with *Wright* that a plain reading of the statute addresses risks, not a particular product device that the plaintiff contends should be altered.

■■■ Our conclusion is also supported by the legislature's focus on "risk" in that section of Chapter 82 specifically addressing the definition of a product defect, i.e., section 82.005. *See* Tex. Civ. Prac. & Rem.Code Ann. § 82.005 (West 2011). In that section, the legislature statutorily defined the word "defect" in design defect claim to include two elements: "a safer alternative design" and causation. *See id.* § 82.005(a).[5] An alternative design is "safer" for purposes of the statute only if it would have (1) significantly reduced the *risk* of the claimant's injuries without substantially impairing its utility and (2) been economically and technologically feasible at the time. *Id.* § 82.005(b); *see also Smith v. Aqua–Flo, Inc.,* 23 S.W.3d 473, 477 (Tex.App.-Houston [1st Dist.] 2000, pet. denied).[6] To prove a safer alternative design under this definition, a party necessarily must compare the risk created by the original design with the risks created by the alternative design. Thus, both the definition of a design defect in section 82.005 and the presumption created in design-defect cases under section 82.008 are defined, in part, by the risks implicated in the case.[7]

■■■ The Hamids argue that the Code Construction Act requires us to consider

---

5. These two elements must be proven, but are not sufficient by themselves to establish a defective design claim. *Honda of Am. Mfg., Inc. v. Norman,* 104 S.W.3d 600, 604 (Tex. App.-Houston [1st Dist.] 2003, pet. denied); *Allen v. W.A. Virnau & Sons, Inc.,* 28 S.W.3d 226, 232 (Tex.App.-Beaumont 2000, pet. denied).

6. Texas courts also require proof that the product was unreasonably dangerous to the user, which is determined by weighing its risk and utility. *Honda of Am.,* 104 S.W.3d at 604 (citing *Hernandez v. Tokai Corp.,* 2 S.W.3d 251, 257 (Tex.1999)). "In addition, a plaintiff complaining of a design defect is required to show that 'the safety benefits from its pro-

posed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety'—that is, that the alternative design not only would have reduced the risk of harm in the instant case, but also would not, 'under other circumstances, impose an equal or greater risk of harm.'" *Id.* (quoting *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 337 (Tex.1998)).

7. Additionally, the plaintiff can defeat the presumption based on a showing that the federal safety standards "were inadequate to protect the public from unreasonable risks of injury or damage. Tex. Civ. Prac. & Rem.Code Ann. § 82.005(b)(1). Thus, a plaintiff's response likewise focuses on risks.

legislative history. But that act is permissive, not mandatory. Tex. Gov't Code Ann. § 311.023(3) ("In construing a statute, whether or not the statute is considered ambiguous on its face, a court *may* consider ... legislative history[.]") (emphasis added); *see also Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 438 n. 13 (Tex.2011) (Jefferson, C.J., concurring); *id.* at 440–42, 451 & n. 78 (Willett, J., dissenting) (noting that the act's language "is permissive" and therefore allows courts to "consider outside aids even absent ambiguity" but the Court's rule that courts should not do so "has been mandatory"). The Texas Supreme Court has repeatedly held that when courts construe statutes, they should start with the text because it is the best indication of the Legislature's intent. *See Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893, 901 (Tex.2010) ("Our ultimate purpose when construing statutes is to discover the Legislature's intent. Presuming that lawmakers intended what they enacted, we begin with the statute's text, relying whenever possible on the plain meaning of the words chosen.") (citations and quotations omitted); *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex.2009) ("Therefore, our practice when construing a statute is to recognize that the words [the Legislature] chooses should be the surest guide to legislative intent."). "When the words of a statute are unambiguous, then, this first cannon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). A court should interpret a statute by reference to its language alone when the court can do so. *Fresh Coat*, 318 S.W.3d at 901. Only when the text is ambiguous is it appropriate for a court to examine legislative history. *Entergy Gulf States*, 282 S.W.3d at 437 ("Where text is clear, text is determi-

native[.]"); *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex.2008) ("When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language."). In this way, courts are able "to avoid sacrificing a clear textual command to conflicting language in an extrinsic, non-authoritative source. The animating principle behind this standard is a reluctance to use legislative history to *interpret* a clear statute." *Ojo*, 356 S.W.3d at 435 (Jefferson, C.J., concurring).

Based on these principles, courts have refused to "give overriding weight to statements" made by legislators during floor debates on the issue before the court. *Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex.2011). "Statements made during the legislative process by individual legislators ... are not evidence of the collective intent of the majorities of both legislative chambers that enacted a statute." *Id.; see also Combs v. Texas Entm't Ass'n, Inc.*, 347 S.W.3d 277, 288 (Tex.2011) (holding that tax was constitutional regardless "of what legislators said or did not say" during legislative process and quoting *United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) for proposition that "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork").

Under the plain language of section 82.008(a), we hold that the threshold determination of whether the presumption applies turns on the relevant product risk, not the particular defect alleged by the plaintiff. We overrule the Hamids' first challenge to the trial court's jury instruction on the rebuttable presumption.

**Conclusion**

Based on the plain language of the section 82.008(a), we reject the Hamids' asser-

tion that the statutory presumption of no liability does not apply when there is not a federal safety standard or regulation that relates to the specific product defect alleged by the plaintiff. Because the Hamids' other challenges to the trial court's submission of a rebuttable presumption instruction under section 82.008 were not preserved by their charge objection, they are waived. We therefore conclude that the Hamids have not established reversible charge error, and we affirm the trial court's judgment.

Justice SHARP, dissenting.

Dissent to follow.